UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Yorgo Foods, Inc.,
      Plaintiff

      v.                                    Case No. 08-cv-438-SM
                                            Opinion No. 2011 DNH 145
Orics Industries, Inc.,
      Defendant

**MEMORANDUM OF DECISION**

The plaintiff, Yorgo Foods, Inc., ("Yorgo"), is in the
business of producing and selling Middle Eastern food products
(hummus, tabbouleh, etc.).  The defendant, Orics Industries, Inc.
("Orics"), manufactures and sells food packaging equipment.
Seeking to increase productivity, Yorgo purchased a food
packaging machine from Orics.  But, due to extended delays in
delivery, Yorgo cancelled the purchase.  Yorgo requested return
of its substantial deposit and, when Orics failed to return the
funds, Yorgo brought suit, asserting breach of contract and
various related causes of action.  Orics, in turn, counterclaimed
for breach of contract.  The case was tried before the court on
the merits.  The pertinent facts are largely uncontested, with
some exceptions related to alleged oral conversations and other
interactions between the parties.

**Relevant Facts**

On December 12, 2006, Yorgo agreed to buy an S-40-DX automated cup filling and sealing machine from Orics, for $150,000.00.  That agreement was memorialized in a document entitled "Proposal for S-40-DX-1up Packaging Machine, Quote #6289C" (hereafter referred to as the "Agreement").

The Agreement called for payment in several stages: 50% of the purchase price was due immediately as a down payment; 40% was due on "acceptance prior to shipment," and the remaining 10% was due 30 days after shipment.  The Agreement also provided that "[d]elay in receipt of down payment and/or delay of subsequent progress payments may cause production and/or shipment delays." Completion of the machine and shipment was to occur in "14 to 16 weeks based on removal of all contingencies," though the Agreement provides no hint as to what "removal of all contingencies" means.

Shortly after Yorgo signed the Agreement, Orics sent an invoice and, on January 3, 2007, Yorgo made the required down payment.  Orics began the design and fabrication process, but at some point after February of 2007, an Orics salesman, Kevin Meek, suggested an addition that would allow the machine to not only fill containers with flowable products (e.g., hummus), as

2

originally contemplated, but also with non-flowable products like salads (e.g., tabbouleh).  Mr. Bechara El-Khoury, Yorgo's principal, had several conversations with Orics' sales representative about the potential change.  Eventually, El-Khoury agreed to add the additional component, an integrated scale and vibratory filler for non-flowable product.  That modification required some redesign by Orics, as well as mechanical alterations to the S-40-DX.

Yorgo could have reasonably expected the machine, as originally ordered, to be completed by either the end of March, or the end of April, 2007 (depending on whether Orics began work when the Agreement was signed by Yorgo, on December 12, 2006, or after the down payment was received, on January 4, 2007).  But, by May it was still not completed.  Given the discussions about a potential change, however, Orics says it justifiably stopped working on the machine at some point after March, awaiting El-Khoury's final decision about adding the vibratory filler and scale.

The specified time for delivery of the original machine expired in April, but the Agreement was amended on July 12, 2007, as documented by a "Revised Order," which was sent to Yorgo.  The Revised Order referenced the original order date of December 13,

2006, and the original order number: #6289C.  It recited that
Orics would "[u]pgrade equipment to new customer request" by
incorporating the vibratory filler and scale [to be obtained from
a third party supplier — Ohlson Co.] and Orics would "extend
machine length to fit Net-Weigh System."  Def. Ex. A, p. 178.
The changes increased the total purchase price to $252,000.00,
and Orics expected an additional down payment of $51,250.00.  The
original delivery term of 14 to 16 weeks was not specifically
modified.  Yorgo made the additional down payment on September
21, 2007.  Orics says that "[o]nce [it] received the additional
down payment money, work on the machine continued in earnest."
Defendant's Post-Trial Brief, at 5.


     Anticipating the addition of a vibratory scale, Orics had
already contacted Ohlson Scales, in May of 2007, to discuss
procurement of the necessary component.  Ohlson is a well-known
manufacturer of such equipment, and Orics planned to buy the
component from Ohlson, then integrate it into the S-40-DX
machine.  Ohlson provided Orics with an initial quote for the
scale in May and, after some exchange of technical data between
Orics and Ohlson, Ohlson sent a revised proposal to Orics in July
of 2007.  Ohlson was prepared to build and deliver the required
filler and scale in 12 to 14 weeks.  But, although the Agreement
between Yorgo and Orics was amended in July, and Yorgo paid the

additional deposit on September 21, Orics did not actually place
an order for the Ohlson filler and scale until November 16.

El-Khoury was anxious to take delivery of the machine and
probably expected that integration of the Ohlson scale would not
delay completion by more than a few weeks.  He was not told by
anyone at Orics that work on his machine would stop and not begin
again until an additional deposit was received, or that an
extended delay in delivery would necessarily accompany the
modification.  By November of 2007, El-Khoury was particularly
upset that nearly a year had passed and the machine he ordered
was not yet complete, even allowing for additional time to make
the requested modification.  (He of course did not know that the
Ohlson scale had just been ordered that month.)

On December 6, 2007, Attorney Victor Dahar wrote to Orics on
behalf of Yorgo to notify Orics that, due to its failure to
deliver the ordered machine, Yorgo was cancelling the contract
and requesting a refund of its deposit.  Mr. Ori Cohen, President
of Orics, testified that he did not recall seeing that letter,
but Kevin Meek, the Orics' salesperson, said he received a copy
of the letter and discussed it with Cohen.  Whether Cohen did or
did not see the letter, it was ignored by Orics.

A month later, on January 9, 2008, El-Khoury's niece, who worked for Yorgo, sent an email to Cohen, inquiring, again, as to when the ordered machine would be finished.  Cohen responded on January 11 that Orics was still waiting for the Ohlson scale, which was expected to take another three to four weeks.  Cohen did not disclose that Orics had yet to review and approve engineering drawings Ohlson had submitted to Orics in December — a necessary prerequisite to Ohlson's completing the filler/scale. Orics did not provide Ohlson with approved drawings until January 29, 2008.  Yorgo, however, did not press its previously announced election to cancel the Agreement for failure to deliver, and both parties continued on, tacitly agreeing that the cancellation communicated by Attorney Dahar was withdrawn and the deal remained viable.

Once it received the approved drawings from Orics, Ohlson expedited its work on the filler/scale and completed it by February 12, 2008.  Orics, however, never took delivery of the filler/scale, and never paid for it.  No plausible explanation was given at trial by Orics, and Ohlson was not able to explain why Orics never took possession of the component.  Without the Ohlson scale, the modified S-40-DX machine obviously could not be completed, tested, and delivered.

From February, when the scale was ready, until June of 2008, El-Khoury continued to inquire, with increasing frustration, about completion and delivery dates.  Orics, primarily through Cohen, continually put him off with oral assurances that the machine was nearly complete, or would be complete in a matter of "a few weeks," or in "ten days," or "soon," etc.  During that period, however, Orics made no effort to obtain the essential piece of equipment necessary to complete the machine — the Ohlson filler/scale.

In its post-trial memorandum (document no. 56) Orics says, implausibly, that "[b]etween February and June of 2008, Orics Industries continued to work on finishing the S-40-DX machine and getting it ready to integrate the automated scale into the system." Id. at 7.  The evidence suggests otherwise — Yorgo's project was generally ignored or given only occasional and sporadic attention.  Both Cohen and Staci Banta (Orics' Project Manager) testified, unpersuasively, that Yorgo's machine was completed in April or May of 2008.  By "complete," however, Cohen and Banta were not suggesting that the machine was fully assembled and awaiting testing and shipping.  Rather, they meant that various component parts or subassemblies could be gathered and combined in a matter of hours or a few days, and then the machine would be ready for testing.  Why Orics never performed

that final assembly — especially given Yorgo's increasing
impatience — remains a mystery.

In April of 2008, El-Khoury prevailed upon Robert
Mikelinich, a sales acquaintance who was planning to be in New
York on other business very near Orics' facility, to stop in and
check on his machine's status.  Cohen showed Mikelinich some
components and a frame.  Mikelinich testified (by deposition)
that the Orics' machine was "just a stainless steel square stock
skeletal frame of a machine," with "no components bolted to it or
welded to it . . . [n]o electrical, no bearings, no nothing."
Mikelinich Dep. at 18.

El-Khoury, though increasingly unhappy, reluctantly accepted
Cohen's oral assurances that the machine would soon be completed,
and refrained from seeking termination.  After all, he wanted the
machine for his business, and had already invested far too much
time in waiting to simply cancel and start over with a different
manufacturer if the greater delay likely inherent in such a
decision could be avoided.  He decided to wait longer.

On June 9, 2008, Cohen again assured Yorgo, by email, that
Orics would "finish the machine next week" and would "send you a
complete report on the exact schedule of completion shipment and

installation," Pl. Ex. 1, p. 5, (belying his trial testimony that it was actually complete in April).  But the Ohlson filler/scale had still not been obtained by Orics, and the machine could not be completed or tested without it.  John Tropp, Orics' own expert, unequivocally testified that the Ohlson scale had to be integrated into the S-40-DX before it could be adequately tested. Tr. Day 3, PM, p. 38.

El-Khoury's patience finally expired in August of 2008 — the machine having still not been completed, the Ohlson scale still awaiting Orics' pick-up, and no reasonable prospect of delivery seemingly in sight.  On August 25, 2008 — more than a year after the parties amended the Agreement to include the filler and scale, and nearly a year after the additional down payment was made — a second letter was sent to Orics by different legal counsel representing Yorgo.  That letter gave notice to Orics that Yorgo deemed it to be in breach of the Agreement.  Yorgo also notified Orics that it was cancelling the Agreement unless Orics delivered a completed functioning machine within ten days, and, failing that delivery, demanded return of its down payment of $128,250.00, as well as legal fees, and interest on the deposited funds.  Orics neither responded, nor delivered the completed machine, nor did it return Yorgo's down payment.

Yorgo filed suit on October 23, 2008, advancing a number of claims: breach of contract (Count I); breach of the duty of good faith and fair dealing (Count II); unjust enrichment (Count III); intentional misrepresentation (Count IV); negligent misrepresentation (Count V); fraud (Count VI); and Consumer Protection Act violations (Count VII). Orics, in turn, filed a counterclaim, alleging that Yorgo breached the Agreement by failing to pay the agreed upon purchase price and by terminating the contract without justification, since the machine, by August of 2008, "was basically complete, and was awaiting final testing and integration." Defendant's Post-Trial Memorandum (document no. 56) at 16. Orics asserted that because Yorgo breached its own contractual obligation to provide packaging material (cups and lids) and food products (hummus, tabbouleh) necessary to test the machine's operation, the project stalled at the testing phase.

Following the bench trial, both parties filed post-trial memoranda and requests for findings of fact and rulings of law. The parties have stipulated that New Hampshire law should be applied in resolving this dispute.

10

**Breach of Contract**

The parties agree that they are merchants who contracted for the sale of goods.  Accordingly, this contract dispute is governed by applicable provisions of the Uniform Commercial Code, as adopted by the State of New Hampshire.  N.H. Rev. Stat. Ann. ch. 382-A (hereinafter "UCC").  The UCC describes "a comprehensive system for determining the rights and duties of buyers and sellers with respect to contracts for the sale of goods" and describes the exclusive remedies available in the event of contract breach.  <u>Spring Motors Distributors v. Ford Motor Co.</u>, 98 N.J. 555, 565, 489 A.2d 660, 665 (1985).

The parties also acknowledge not only the Agreement, but its operative terms, though they of course construe some relevant terms differently.  The principal issue here is the time in which Orics was required to perform under the Agreement — that is, to complete fabrication and ship the modified S-40-DX machine. Yorgo says Orics failed to deliver as required; Orics counters that it would have delivered in timely fashion but for Yorgo's own breach of the Agreement and unjustified termination.

As noted, the initial Agreement signed by Yorgo on December 12, 2006, provided that the machine would ship (so, necessarily, would be complete) in "14 to 16 weeks based on removal of all

11

contingencies."  The form also stated that any "delay in receipt
of down payment . . . may cause production and/or shipment
delays."  The shipment date was based on "current production
schedules" and was valid for "30 days."  So, Orics was required
to complete and ship the machine in 14 to 16 weeks or, time not
being of the essence, within a reasonable time thereafter,
assuming no disruptive "contingencies."  The Agreement did not
describe what kind of "contingencies" might warrant delay in
performance, though it was apparent from the Agreement's terms
that a delay in receipt of Yorgo's down payment "may" cause
production or shipment delays.

The amended Agreement signed in July of 2007, was described
by Orics as a revision of the original order.  The amended
Agreement did not purport to alter the delivery terms.  Rather,
the amendment merely added language to the effect that Orics
would "[u]pgrade equipment to new customer request," integrating
the vibratory filler and scale to be obtained from Ohlson.  Joint
Exhibits, at 179.

Evidence was presented at trial suggesting that it is
customary in the industry for a manufacturer to refrain from
working on orders until the requisite down payment is made.
Accepting the reasonableness of that practice at face value,

Orics was obligated to begin working on the modified machine, at
the latest, when Yorgo made the additional down payment on
September 21, 2007.  The amendment modified the contract in a
substantive way and both Yorgo and Orics necessarily understood
that additional redesign work and mechanical changes would be
required, which, in turn, would require additional time to
complete.

On January 11, 2008, Cohen, by email, represented that
Yorgo's machine was almost ready, and would be completed shortly.
Cohen wrote:

> The Ohlson scale for the Tabuli will be done in 3-
> 4 weeks, the machine frame is ready to be welded and
> assembled, the tools are done and ready for assembly on
> the frame, as you know we had to change the entire
> frame size and shape and the machine operation by
> adding the Tabuli filler, as soon as the Tabuli filler
> will be at our facility we will integrate it test it
> and will be ready for FAT factory acceptance test.

Joint Exhibits, p. 222.  The gist of that communication was that
as soon as Orics procured the Ohlson scale, completion of the
machine would be just a matter of assembling the component parts
and testing it.  Yet, three months later (in April of 2008) that
assembly had not been accomplished, and the Ohlson scale
inexplicably remained at the Ohlson plant, ready to be acquired
and installed.  In fact, by June of 2008, some six months after
Cohen's January 11 assurances, the component parts had still not

13

been assembled (nor had Orics even obtained the completed
filler/scale from Ohlson).  On June 9, 2008, Cohen again emailed
El-Khoury at Yorgo, promising to "finish your machine next week"
and to "send you a complete report on the exact schedule of
completion shipment and installation."  Yorgo Ex. at 5.

Testimony by Kevin Meek, a former Orics' salesperson,
offered at least one plausible explanation for Orics' continuing
failure to complete: Orics was too busy filling other, presumably
more important orders, so deferred Yorgo's project as necessary.
Cohen's own testimony supported that explanation.  He admitted
that a project larger than Yorgo's was begun on January 29, 2008,
and completed on June 5, 2008 (i.e., in approximately four
months).  Tr. Nov. 18, 2010, AM, pp. 43-47.

Orics never obtained the completed Ohlson filler/scale, and
it offered nothing of substance to explain that critical and
ongoing failure.  The only plausible explanation, given this
record, is managerial neglect.  There is no evidence suggesting
that Orics was in financial trouble and could not pay for the
Ohlson scale; there is no evidence suggesting that Orics harbored
some animosity toward Yorgo that motivated it to deliberately
string Yorgo along with no intent to actually build the machine
(it was eventually partially assembled in the Fall of 2008,

14

albeit still without the Ohlson scale, the very object of the amendment); and surely Orics would have been far better off economically had it paid for the filler/scale when it was completed in February, taken delivery, and did what Cohen said it would do in his January 11 email — finish the job.

As noted, the amended Agreement did not purport to vary the delivery term in the original Agreement.  But, plainly, the revised order called for substantive changes to the S-40-DX machine, and the time set for delivery in the original Agreement had expired two months before the revised order was accepted by the parties.  Orics also points out that the delivery term in the original Agreement applied to what was essentially a standard-platform packaging machine, while the amended Agreement contemplated a "custom" machine, that required modifications to the standard S-40-DX design platform.  The new machine, says Orics, took much longer to redesign, modify, and build than the standard machine Yorgo initially ordered.

Accordingly, says Orics, it would be unreasonable to hold it to the original delivery term of 16 weeks, either by applying the original term to the revised order, or imposing that term as describing a "commercially reasonable time" in which to deliver the modified machine.  UCC §§ 1-205 and 2-309(1).  I find that

15

Orics generally overstates the complexity involved.  Cohen
testified that absent other work and distractions, the modified
Yorgo project could have been completed in two to three months.
Cohen himself told Yorgo, in January of 2008, that completion was
only a few weeks away, and in June of 2008, he again told Yorgo
that completion was only a week or so away.  Still, Orics has a
point.

     Assuming the modification effectively rendered indefinite
the 16 week delivery time specified in the original Agreement,
then the UCC imposes a "reasonable" time for delivery.  Section
2-309(1) provides:

          (a) The time for shipment or delivery or any other
     action under a contract if not provided in this Article
     or agreed upon shall be a reasonable time.

A "reasonable time" is for the finder of fact to determine,
taking into account the nature, purpose, and circumstances of the
transaction, including the parties' course of dealing, usages of
trade in the pertinent industry, and the parties' course of
performance.  Superior Boiler Works v. R.J. Sanders, Inc., 711
A.2d 628, 636 (R.I. 1998).

     Orics offered expert opinion evidence at trial with respect
to what period would be considered, in the packaging machine

manufacturing industry, a commercially reasonable time in which
to complete Yorgo's machine.  Joel Tropp, an expert in that field
testified that:

> In going back and looking at, again, the work in
> process — and I know what the individual assemblies
> were, so I know what was done — I would say that
> somewhere in the month of April, either the beginning
> or the end, I'm not sure, right, somewhere at that time
> the machine would have been — should have been ready
> for final testing.

Tr. Day 3, PM, p. 21.  Mr. Tropp also testified that, to be
tested, the machine had to be in the same condition as it would
be in the customer's factory.  Id. at 38.  That is, fully
assembled, with the Ohlson scale fully integrated.  Id.
According to Tropp, a customer, like Yorgo, should not be told
that a packaging machine is complete and ready for testing if the
components and subassemblies have not been put together, and the
scale to be integrated is still at the fabricator's facility in
another state.  Id.  (Tropp, also, could think of no technical
reason why the completed Ohlson scale was not obtained by Orics
and integrated into the S-40-DX.)


    In Tropp's expert opinion, a reasonable time in which to
complete a machine like Yorgo's would have been between six and
eight months, from payment of the additional deposit (September
21, 2007), with an "outside time" of eight to ten months ("but I

17

would go between six and eight months, would be a reasonable time to complete the machine and get it ready for testing."). <u>Id</u>. at 27.  Yorgo offered no contrary evidence with respect to what a commercially reasonable time for completion of the modified machine would be.

Even accepting Tropp's opinion, however, and applying the six to eight month delivery term described by him as the reasonable time in which Orics should have completed and delivered the modified machine, Orics still failed to make timely delivery.  The machine was not assembled, complete, and ready for testing in April of 2008 (seven months) when Tropp said it should have been completed, or in May (eight months), or even in July of 2008 (ten months).  By August 25, 2008, when notice of termination was given by Yorgo, Orics had exceeded even the outside limit on the reasonable delivery time that its own expert could support.

Orics argues, unpersuasively, that it was Yorgo's fault that the machine was never delivered — that if Yorgo had only heeded repeated calls from Ori Cohen and Staci Banta to provide Orics with adequate quantities of sample packaging (the cups and lids) and products (hummus and tabbouleh) necessary to <u>test</u> the machine, all would have been well.  Orics' point seems to be that

18

had it first been given packaging and product to test in a timely
fashion, <u>then</u> it would have assembled the machine, tested it, and
shipped it.

I reject that argument out of hand.  It is simply not
credible, and I find Cohen's and Banta's testimony to that effect
unpersuasive.  I also completely reject Orics' claim (through
Cohen and Banta) that El-Khoury or anyone working for Yorgo was
told that delay in completion and delivery of the modified
machine was due to Yorgo's failure to deliver testable packaging
and product.  I also find unpersuasive the suggestion that El-
Khoury, who was energetically seeking delivery, would have
undermined his own demands for delivery by failing to provide a
few gallons of hummus, or a few boxes of cups and lids, had he
been told that they were necessary to obtain delivery of the
machine, and a direct request for those materials was made.
Orics' position is not consistent with the fact that the machine
was never assembled before Yorgo terminated the Agreement and,
so, was never ready to be tested.

This is a case in which the buyer's patience and expectation
that the seller would eventually perform was rewarded with
neglect and empty assurances.  Orics, for reasons satisfactory to
it, gave Yorgo's project a low priority.  Orics no doubt would

19

have eventually completed the machine, tested it, and shipped it,
but it would have done so only in its own good time.

Having failed to make delivery within a commercially
reasonable time after September 21, 2007, whether that time
expired in April of 2008, or June of 2008, or even July of 2008,
and indeed, having failed to make delivery by August 25, 2008
(some eleven months after Yorgo's supplemental deposit was
received), without justification or excuse, Orics plainly
breached the Agreement. "Although a variety of factors may
explain nondelivery, its occurrence is simple enough. Some
breaches are easy to prove; if without excuse the seller fails to
deliver at all or fails to deliver on time, his breach is clear."
White Summers, Uniform Commercial Code, Fifth Edition, § 6-2, p.
374, 1996. Orics, as it concedes, never delivered at all, and
its breach is clear. Orics had no legitimate excuse for its
breach; the excuse offered — that Yorgo prevented delivery by
undermining Orics' ability to test the machine is not credible
and is rejected.

When a seller breaches a contract for the sale of goods by
failing to deliver, the UCC affords the buyer a number of
remedies, including the right to cancel the contract, recover so
much of the price as has been paid, and, as provided in § 2-713,

20

recover incidental and consequential damages for nondelivery. UCC §§ 2-711, 2-713.  In addition, the buyer is entitled to recover interest on the purchase price paid (here the two down payments), at the legal rate, from the date of cancellation and demand upon the seller.  See Lanners v. Whitney, 428 P.2d 398, 247 Ore. 223 (1967).

Plainly, then, Yorgo is entitled to recover its down payments, and interest at the legal rate on that amount commencing ten days after the date of Yorgo's August 25, 2008, cancellation notice (the date upon which Yorgo effectively terminated the Agreement).

**Damages**

Yorgo also seeks damages for Orics' breach.  Yorgo's cancellation of the Agreement does not preclude it from recovering damages for breach under the UCC.  Cancellation and recovery of damages are not exclusive remedies.  See Robertson Cos. v. Kenner, 311 N.W.2d 194 (N.D. 1981).  Yorgo does not seek incidental damages (§ 2-715(1)), but does seek consequential damages in a particular respect.  Yorgo argues that had delivery of the machine been made in a timely fashion it would have been able to reduce its work force by four employees.  Accordingly, it claims, as consequential damages, the salary and associated costs

of those employees from the time delivery should have been made
through June of 2009 (when it obtained a different packaging
machine).

Under the UCC, consequential damages resulting from a
seller's breach include:

> (a) any loss resulting from general or particular
> requirements and needs of which the seller at the time
> of contracting had reason to know and which could not
> reasonably be prevented by cover or otherwise.

The burden of proving the extent of loss incurred by
consequential damage is on the buyer, but the loss may be
established in any manner that is reasonable under the
circumstances.  See RSA 382-A 2-715, official comment 4.

I find that Yorgo's trial evidence failed to establish its
entitlement to consequential damages.  To be sure, Mr. El-Khoury
testified that he expected acquisition of the packaging machine
would allow him to reduce his work force by four employees.  An
accountant then offered his calculation of the costs that Yorgo
could have avoided over a defined period of time had four
employees been let go.  But there was scant evidence supporting
the claim that operation of the machine would have likely
resulted in the hoped-for reduction in force.  And, Yorgo did not
establish that Orics had reason to know that failure to deliver

22

the machine would result in Yorgo's inability to reduce its
workforce by four employees, or that the loss occasioned by
failure to deliver "could not reasonably be prevented by cover or
otherwise."  UCC § 2-715(2).  El-Khoury merely said that he
expected to lay off four employees.  But he had no experience
with packaging machines like the S-40-DX, and was not promised
that type or degree of savings by Orics.

   Yorgo failed both to establish the claimed loss in a manner
that was reasonable under the circumstances (i.e., no expert
familiar with the production capacity of the modified S-40-DX and
Yorgo's work force testified; no comparative authoritative
studies were produced; no industry standards or accepted norms
were referenced), and Yorgo failed to establish that Orics had
reason to foresee the nature and extent of the claimed loss.  See
e.g., Hydraform Prods. Corp. v. American Steel & Aluminum Corp.,
127 N.H. 187 (1985); Bailey v. Sommovigo, 137 N.H. 526, 531
(1993).

   Orics, on the other hand, presented evidence to the effect
that the S-40-DX automated filler would certainly increase
production beyond that achievable by the largely manually
operated system then in place at Yorgo.  But, the new machine

would still require adequate staffing, and was not likely to
result in a reduction of the current workforce.

I do not find the evidence of consequential damages
presented by Yorgo sufficient to reasonably establish the claimed
losses.  The "unsaved labor costs" claim is speculative at best,
inadequately supported, and in the end unpersuasive.
Accordingly, consequential damages, as claimed, are not awarded.

### Breach of the Covenant of Good Faith and Fair Dealing

Yorgo also asserts a claim for breach of the implied
covenant of good faith and fair dealing.  "[A]n obligation of
good faith is imposed by statute in the performance and
enforcement of every contract or duty subject to the Uniform
Commercial Code."  Centronics Corp. v. Genicom Corp., 132 N.H.
133, 138 (1989) (Souter, J.); see also RSA 382-A:1-304 ("Every
contract or duty within this chapter imposes an obligation of
good faith in its performance and enforcement."); RSA 382-A:1-201
("'Good faith,' except as otherwise provided in Article 5, means
honesty in fact and the observance of reasonable commercial
standards of fair dealing.").  And, as detailed in Centronics,
New Hampshire's common law also recognizes an implied covenant of
good faith and fair dealing in every contract.

But, "[i]t is generally accepted that the good faith standard of U.C.C. [§ 1-304] does not create an independent cause of action and that it does not create an obligation conceptually separate from the underlying agreement." Wortley v. Camplin, 333 F.3d 284, 293 (1st Cir. 2003) (citation omitted). Similarly, New Hampshire's common law does not recognize a cause of action for breach of the implied covenant of good faith and fair dealing outside the contractual context. J & M Lumber & Constr. Co. v. Smyjunas, 161 N.H. 714, 724 (2011). As noted in Centronics,

> Our own common law of good faith contractual obligation is not, however, as easily stated as we might wish, there being not merely one rule of implied good faith duty in New Hampshire's law of contract, but a series of doctrines, each of them speaking in terms of an obligation of good faith but serving markedly different functions. Since the time of our first contract decision couched in terms of good faith, Griswold v. Heat Corporation, 108 N.H. 119, 229 A.2d 183 (1967), we have relied on such an implied duty in three distinct categories of contract cases: those dealing with standards of conduct in contract formation, with termination of at-will employment contracts, and with limits on discretion in contractual performance.

Centronics, 132 N.H. at 139.

In its complaint (Count II), Yorgo seems to invoke the first referenced category — that is, conduct related to contract formation. But its post-trial brief seems to rely on the third category — that is, limits on discretion. In either event, I

25

find that Yorgo has failed to carry its burden of proof with respect to this claim.

The evidence presented does not establish that Orics engaged in bad faith conduct of any sort in connection with formation of the Agreement.  Like Yorgo, Orics had a genuine economic interest in the Agreement.  Orics is in the business of designing and building packaging machines and Yorgo wished to obtain such a machine.  There was no evidence presented to support a claim that Orics negotiated the contract with the intent not to perform, or that it knew it could not perform.  Indeed, Yorgo took the position at trial that Orics <u>could</u> have built its machine in timely fashion, but instead chose to apply its resources to competing projects, <u>i.e.</u>, other customers with more profitable jobs, or more important status.  That explanation for the inordinate delay was supported by the evidence, but even if true, such a choice by Orics likely would not support a claim for breach of the covenant of good faith and fair dealing.

What Yorgo complains about primarily, of course, is that Orics repeatedly promised to complete the machine in short order, yet continually failed to do so, while Yorgo continually relied upon those promises in delaying exercise of its right under the UCC to terminate the Agreement for failure to deliver.  Yorgo was

26

free, however, to exercise its contractual rights, or not, as it
deemed appropriate.  It waited because it thought that was the
better course.[1]  While the court is sympathetic to Yorgo's
plight, still, Yorgo made a series of judgments about Orics'
competence and reliability in deciding to wait, and it turns out
that Yorgo made the wrong choice.

Yorgo has not proven either that Orics' conduct in
negotiating the contract's formation was in breach of its good
faith obligations, or that the contract vested Orics with a
degree of discretion that Orics exercised contrary to its good
faith obligations.  Orics had no discretion with respect to the
delivery term; it was obligated to meet it.  It failed, and
thereby breached the contract, but that breach does not also
amount to a breach of the covenant of good faith and fair
dealing.

I find that Yorgo has not proven a good faith and fair
dealing claim that is recognized under either the UCC or New
Hampshire's common law.

---

[1]     In hindsight, Yorgo was perhaps wise to wait until
August to cancel, since it presented no contrary evidence
regarding what, in the pertinent industry, would constitute a
reasonable time in which to complete the modified machine.  That
time could well have expired as late as July of 2008, according
to Orics' expert.

**Unjust Enrichment**

Yorgo's unjust enrichment claim (Count III) fails as well. A cause of action for unjust enrichment does not lie when a valid unrescinded contract governs the rights of the parties.  See Clapp v. Goffstown Sch. Dist., 159 N.H. 206, 210-11 (2009). Here, the rights of the parties are governed by the Agreement and applicable provisions of the Uniform Commercial Code.

**Intentional Misrepresentation,
Negligent Misrepresentation, and Fraud**

Yorgo's negligent misrepresentation, intentional misrepresentation, and fraud causes of action are based, essentially, upon the premise that well after the time for delivery had passed, Orics, through its principal and chief engineer Ori Cohen, "assured Yorgo again and again that the machine would be ready in one to two weeks, even though he was aware that Orics had not received the scale from Ohlson and had not integrated it with the machine."  Plaintiff's Post-Trial Brief, at 17.

It is true that Orics seemed to have little compunction in making promises of imminent action, only to repeatedly fail to realign its work priorities.  As noted earlier, the likely explanation for those failures is that Orics simply had more work than it could handle and, during the period between December of

28

2006 and August of 2008, Yorgo's project was a low priority for
Orics. But there is little evidence supporting Yorgo's claim
that Cohen deliberately told El-Khoury that the machine would be
completed in the near future with no intention to fulfill that
promise. The road to ruin is supposedly paved with good
intentions, and that appears to be the road Cohen regularly
travelled. But expressions of good intentions are not generally
actionable.

Under New Hampshire law, "[A] promise is not a statement of
fact and hence cannot, as such, give rise to an action for
misrepresentation." Hydraform Prods. Corp. v. American Steel &
Aluminum Corp., 127 N.H. 187, 200 (1985). "A promise, therefore,
will only give rise to a claim of misrepresentation if, at the
time it was made, the defendant had no intention to fulfill the
promise." Thompson v. H.W.G. Group, 139 N.H. 698, 701 (1995).
No evidence was presented that persuades me that Orics was
incapable of fulfilling its promises when Cohen made them, or
that Cohen had no intention of doing so. Though painfully slow
from Yorgo's perspective, Orics did stumble along toward
completion in fits and starts. It did design the modified
machine. It assembled various components, fabricated the basic
frame, and arranged for fabrication of the Ohlson scale. It was
not an effort likely to have satisfied even the most indifferent

customer, but neither was it an effort indicative of an intention not to perform at all.  And there was no reason for Orics not to perform — it undoubtedly would have eventually performed, given its own substantial investment in the project, and the risk of economic loss associated with non-performance.

Because the evidence does not support a factual finding that Cohen had no intention of fulfilling his promises of completion and delivery when those promises were made, Yorgo cannot recover on its negligent misrepresentation, intentional misrepresentation, or fraud claims.

### Consumer Protection Act

Yorgo's Consumer Protection Act Claim (N.H. Rev. Stat. Ann. ("RSA") ch. 358-A) also necessarily fails for a number of reasons.  Although the Act broadly provides that "[i]t shall be unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within [New Hampshire]," RSA 358-A:2 (emphasis supplied), the New Hampshire Supreme Court has authoritatively held that "[a]n ordinary breach of contract claim does not present an occasion for the remedies under the Consumer Protection Act."  Barrows v. Boles, 141 N.H. 382, 390 (1996); Milford Lumber Co. v. RCB Realty, 147 N.H. 15, 19 (2001).

Yorgo of course argues that Orics' conduct went beyond a
straightforward breach of contract in that it made multiple
promises of imminent completion and delivery when it knew that it
had not yet obtained the Ohlson scale, so could not complete the
machine and ship it, and Yorgo relied to its detriment on those
empty promises.  As noted earlier, however, Orics' many
statements of intention constituted promises of future action,
not representations of fact, so cannot support a
misrepresentation claim.  I find that Orics <u>could</u> have completed
the machine, as promised, easily enough.  It merely had to obtain
the Ohlson scale (after February of 2008, a matter of a day or
two at most) and then assign the necessary workforce to complete
the job.  Hence, Yorgo's frustration.  That Orics did not do so,
as required by the Agreement, and that Yorgo decided to wait
perhaps beyond the time it was required to wait, however, does
not turn the underlying dispute into something other than an
ordinary contract dispute between merchants.

And, for Yorgo to recover under the Consumer Protection Act,
Orics' repeated promises of delivery would have to "attain a
level of rascality that would raise an eyebrow of someone inured
to the rough and tumble of the world of commerce."  <u>Barrows</u>, 141
N.H. at 390 (citation omitted).  Repeated assurances of future
performance by merchants, made to placate unhappy customers, even

31

unrealistic assurances, are not unknown in the rough and tumble of the world of commerce.  When assurances of performance prove meritless, the UCC provides a ready remedy.  Buyers not tolerant of such unfulfilled promises are entitled to cancel and recover down payments made, provable incidental and consequential damages, and interest.  Orics' repeated promises and failures (whether due to choices to serve other customers first, or common mismanagement) were hardly admirable, but did not rise to the level of rascality necessary to support a cause of action under New Hampshire's Consumer Protection Act.

### Attorney's Fees

Finally, Yorgo seeks an award of its reasonable attorney's fees.  The Agreement does not address the issue directly, and courts have found "silence to be the simplest way to draft a contract to indicate that no such fees are contemplated by the parties."  Indiana Glass Co. v. Indiana Mich. Power Co., 692 N.E.2d 886, 887 n.1, (Ind. App. Ct. 1998).  The parties could easily have included a fee-shifting provision in the Agreement had they intended to avoid the general rule that parties bear their own legal fees, but they did not.  And, attorney's fees are generally not recoverable under § 2-715 of the UCC as incidental or consequential damages in contract breach actions.  Id. (citing Nick's Auto Sales, Inc. v. Radcliff Auto Sales, Inc., 591 S.W.2d

709 (Ky. Ct. App. 1979) (holding that, in accordance with the overwhelming weight of authority from other states that attorneys' fees are not recoverable under UCC § 2-715)).

On the other hand, the UCC does not foreclose the possibility of recovering attorney's fees in a contract action. Section 1-103 of the Code "emphasizes the continued applicability to commercial contracts of all supplemental bodies of law except insofar as they are explicitly displaced by the provisions of the UCC." Indiana Glass Co., 692 N.E. 2d at 889.  Section 2-715 does not explicitly provide for (or preclude) recovery of attorney's fees, so, like other state courts that have considered the issue, New Hampshire's courts would likely conclude that the UCC's provisions were not intended to and do not abrogate the common law principles governing awards of attorney's fees.

New Hampshire's common law permits recovery of attorney's fees under very limited circumstances.  "A prevailing party may be awarded attorney's fees when that recovery is authorized by statute, an agreement between the parties, or an established judicial exception to the general rule that precludes recovery of such fees."  Town of Nottingham v. Newman, 147 N.H. 131, 137 (2001) (citation and internal punctuation omitted); see also Grenier v. Barclay Square Commer. Condo. Owners' Ass'n, 150 N.H.

33

111, 117 (2003).  The New Hampshire Supreme Court has established judicial exceptions to the general rule that parties bear their own attorney's fees, recognizing

> exceptions where an individual is forced to seek
> judicial assistance to secure a clearly defined and
> established right if bad faith can be established;
> where litigation is instituted or unnecessarily
> prolonged through a party's oppressive, vexatious,
> arbitrary, capricious or bad faith conduct; as
> compensation for those who are forced to litigate in
> order to enjoy what a court has already decreed; and
> for those who are forced to litigate against an
> opponent whose position is patently unreasonable.

Business Publications v. Finnegan, 140 N.H. 145, 147 (1995).  See also Daigle v. City of Portsmouth, 137 N.H. 572, 574 (1993).


It is the last described exception that arguably applies here.  The dispositive question, then, is this: After Yorgo terminated the Agreement, was it forced to litigate against an opponent whose litigation position was patently unreasonable?  In considering that question, the focus is not on Orics' indolence and unfulfilled promises of future performance, nor on the consequences of its breach.  Rather, "[t]he focus in such cases is on a litigant's unjustifiable belligerence or obstinacy where an action is commenced, prolonged, required or defended without any reasonable basis in the facts provable by evidence."  Grenier, 150 N.H. at 118.  The decision to award or decline to award fees under the described judicial exception is highly

34

discretionary, and given "tremendous deference." <u>Id</u>. at 116;
<u>Daigle</u>, 137 N.H. at 574.

Yorgo's claim is not an unsympathetic one.  It argues that
Orics very well knew that it had made repeated promises of
completion and delivery from November of 2007, onward, and
repeatedly failed to perform.  Accordingly, Orics knew that once
Yorgo unambiguously exercised its right to terminated the
contract, the down payment should have been promptly refunded,
and Yorgo should not have had to bring suit to recover that down
payment.

But Yorgo's claim is not one that fits within the limited
exception to New Hampshire's general rule that parties to
litigation bear their own legal fees.  Here, Orics readily
conceded that it never shipped the machine, but interposed a
defense recognized in law: that Yorgo's own contract breach
precluded Orics from delivering, or excused it's failure to
perform, and, indeed, required Yorgo to pay damages — the full
contract price.  Orics points out that the Agreement specifically
contemplated "factory acceptance testing" before shipment of the
machine, and that type of pre-shipment testing is well-understood
in the industry.  (The Agreement specifically provides that 40%
of the purchase price was due on "acceptance prior to shipment.")

Cohen testified that, particularly with new customers and unfamiliar products, testing before shipment is critical to successful operation of the packaging machine.  He also testified that Yorgo understood from the outset that testing samples, both of packaging (cups and lids) and food products, had to be provided before the factory acceptance tests could be run. Finally, he testified, supported by Staci Banta's testimony, that El-Khoury was uncooperative, would not come to the Orics factory to participate in the required testing, and never provided the required samples.  Shipment did not occur, says Orics, because testing could not occur due to Yorgo's breach.

The machine was "complete," Cohen and Banta said, in April of 2008, in the sense that had Yorgo complied with its own obligations to cooperate in carrying out the anticipated factory tests and to provide testing samples, the fabricated components would have been quickly assembled, including the Ohlson scale (located only four hours away in Massachusetts).  Testing and shipment would then have promptly followed.  Orics, Cohen pointed out, had every economic incentive to complete and ship the machine, and little incentive to stall.  Indeed, said Cohen, Orics had already invested far more money in designing and building the machine than was covered by Yorgo's down payment,

and Orics reasonably expected Yorgo to cooperate in testing, and
to pay the full purchase price.

Orics' defense and counterclaim for breach as described were
weak, to be sure, and have been rejected as explained earlier.
But, on this record, I cannot find Orics' litigation position to
have been "patently unreasonable" merely because it was weak and
unsuccessful.  See Guaraldi v. Trans-Lease Group, 136 N.H. 457,
462 (1992).  As in Guaraldi, the record here includes conflicting
testimony which could reasonably be interpreted differently with
respect to the commercially reasonable obligations of a buyer of
packaging machines.  While there is an absence of documented
correspondence between the parties regarding critical demands for
testing supplies, and when they were expected to be supplied, the
Agreement does contemplate the testing process, and provision by
the buyer of materials necessary to that process.  So, there was
a basis in law and in the contract for Orics' litigation
position, and Orics did offer some evidence of facts necessary to
support its position.

Had the evidence been stronger regarding Orics' claims that
the machine was essentially "complete" and could have been
adequately tested, and had the evidence been more persuasive that
El-Khoury was told directly that his failure to provide the

37

required testing materials was the only remaining impediment to
delivery, the outcome of this litigation might have been
different. I have found Orics' position to be insufficiently
supported, unpersuasive, and without merit, but I cannot find, on
this record, that it was frivolous or patently unreasonable, in
that it "lacked any reasonable basis in the facts provable by
evidence . . . in the law as it is, or as it might arguably be
held to be." Guaraldi, 136 N.H. at 463 (quoting Adams v.
Bradshaw, 135 N.H. 7, 18 (1991)). See also Daigle, 137 N.H. at
575. Absent such a finding, attorney's fees are not recoverable
under the judicially created exception to New Hampshire's general
common law rule.


Accordingly, New Hampshire's general rule applies, and each
party to the litigation must bear its own legal fees.


### Orics' Counterclaim for Breach of Contract

For the reasons given above, I find in favor of Yorgo on
Orics' breach of contract counterclaim. Orics failed to meet its
burden of proof regarding Yorgo's alleged breach. To the
contrary, I find that the machine was never in a completed
condition sufficient to test it. I accept Joel Tropp's testimony
that the machine had to be assembled as it would be in the
buyer's facility as a prerequisite to adequate testing. I credit

38

El-Khoury's testimony that he was not told that the machine was complete and ready for testing, awaiting only Yorgo's supplying materials to test.  I do not credit Cohen and Banta's claims that El-Khoury knew that the lack of testing materials was all that kept the machine from being completed, tested and shipped, or that he was uncooperative, or that he refused requests to supply testing materials.  Yorgo did not breach the Agreement.

### Conclusion

Judgment shall be entered in favor of plaintiff on its breach of contract claim (Count I).  Judgment shall be entered in favor of defendant on plaintiff's breach of the duty of good faith and fair dealing claim (Count II); its unjust enrichment claim (Count III); its intentional misrepresentation claim (Count IV); its negligent misrepresentation claim (Count V); its fraud claim (Count VI); and its Consumer Protection Act claim (Count VII).  Judgment shall be entered in favor of plaintiff on defendant's breach of contract counterclaim.

Defendant shall refund plaintiff's down payment(s) in full, with interest at the legal rate from September 4, 2008, until paid.  Each party shall bear its own legal fees.  This Decision shall constitute the court's findings of fact and rulings of law. Fed. R. Civ. P. 52(a)(1).  If either party believes this decision

leaves specific requests for findings of fact or rulings of law unaddressed, that party may, by pleading filed within fourteen (14) days of the date of this order, identify those specific requests and a ruling will be made.

**SO ORDERED.**

Steven J. McAuliffe
Chief Judge

September 29, 2011

cc:  Ronald E. Cook, Esq.
     Clara A. Dietel, Esq.
     Paul R. Kfoury, Sr., Esq
     Lisa M. Lee, Esq.
     Andrew B. Livernois, Esq.

40